## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO
_____

**LORRAINE TERCERO and**
**SANDRA HERNANDEZ,**

**Plaintiff,**

**v.**                                                              **CIV. No.  98-180 JP/WWD**

**CITY OF ROSWELL, NEW MEXICO,**
**FORMER JUDGE RICHARD T. HOOVER,**
**and ROSWELL CITY MANAGER JOHN CAPPS,**

**Defendants.**


## MEMORANDUM OPINION AND ORDER

On March 31, 2000 Defendants Hoover (Doc. No. 67), Capps, and the City of Roswell
(Doc. No. 62) filed motions for summary judgment.  Defendant Hoover's motion will be granted
in part and denied in part.  Defendants Capps' and the City of Roswell's motion will be granted.

### Background

#### I.        Evidence

Before delving into the facts, certain evidentiary matters must be addressed.  Plaintiffs
attached in support of their responses to Defendants' motions a rather large quantity of excerpts
from depositions taken during the course of the Judicial Standards Commission ("JSC")
proceeding against Defendant Hoover and in a related case.  Defendants have withdrawn their
initial objections to this evidence.  Plaintiffs also attached selections of testimony before the JSC
and in a related case.  Defendants withdrew their objections to testimony in the related case.

However, Defendants maintain their objections to testimony before the JSC on the ground that it should be certified.  Defendants also maintain objections to a letter sent by Shirley Kennedy, now deceased, to Peg Holguin, JSC Director.  Defendants also object to a series of newspaper articles which Plaintiffs attached as evidence.  Finally, all parties raise hearsay and relevance objections to certain facts in the opposing parties' statements of material facts.[1]

With respect to the JSC testimony, the more prudent course would be to have it certified. See Montes v. Gallegos, 812 F. Supp. 1159, 1161 n. 1 (D.N.M. 1992) (Parker, J.).  Plaintiffs have offered to do this.  However, certain parts are hearsay in content and would not be admissible, absent stipulation or use for other than truth, even if certified.  See Thomas v. IBM, 48 F.3d 478, 484 (10th Cir. 1995).  But any hearsay problems and lack of certification are of no concern because consideration of the proffered evidence would not change the disposition of these motions.  The testimony offered is cumulative and/or not relevant to the statute of limitations considerations controlling the disposition of these motions.  The letter from Shirley Kennedy similarly has no bearing on the outcome of this motion, in spite of its apparent lack of hearsay risk.  The newspaper articles are also not relevant and therefore have no bearing on the present motions even if considered.  The remaining hearsay and relevance objections to individual facts will be dealt with later in this opinion.

## II.    Facts

At all material times, Plaintiffs worked for the City of Roswell ("the City") as clerks in the Municipal Court.  (Pretrial Order Stip. Fact 1.)  Defendant Hoover was at all material times the

---

[1] Plaintiffs' statement of material facts, not contemplated by local rule, caused Defendants to produce a fact-by-fact list of objections like Plaintiffs themselves created in response to Defendants' statements of material facts.

presiding Municipal Judge.  (Id. Stip. Fact 4.)  Defendant Hoover took office in March 1994.

Hoover Fact 4.)[2]  Sometime between May 1994 and September or October 1994, Defendant

Hoover brought to the courthouse a portrait of Jesus Christ.  (Id.; Resp. to Hoover Fact 4; Capps

Fact 6.)  Defendant Hoover hung the picture in a file room, on the south wall, about one foot

below the ceiling, above some file cabinets.  (Hoover Fact 5.)  The file room was adjacent to

Defendant Hoover's chambers and behind the court clerk's office.  (Capps Fact 8; Ex. 1 to

Tercero depo.)  An opaque glass wall, through which nothing could be seen clearly, separated the

clerk's office from the file room.  (Hoover Fact 6.)  Members of the public were allowed into the

file room only after admittance by the clerk's staff.  (Resp. to Hoover Fact 4; Tercero depo. at

12.)  The court clerk's staff members, attorneys, repairmen, and convicts performing public

service sentences used the file room.  (Capps Fact 9.)  Anyone visiting Defendant Hoover in his

chambers had to first pass from the clerk's office through the file room.  (Hoover Answer ¶ 6.)[3]

The picture was not visible from the clerk's office counter area, the courtroom, or the hallway

leading to the courtroom.  (Capps Fact 10.)  A person could see the picture only while within the

file room or when at the file room door.  (Id.)  The picture hung in the file room until Defendant

Hoover was removed from office in March 1996.  (Hoover Answer ¶ 20.)  Both Plaintiffs were

aware of the picture and were not offended by it.  (Tercero depo. at 22; Hernandez depo. at 27,

32.)  However, they objected to its placement in the courthouse.  (Tercero depo. at 21-24;

Hernandez depo. at 32.)  Defendant Hoover was angered at Plaintiff Hernandez' stated objection

---

[2] This and other facts from Defendants' statements of material fact are admitted, except where noted.

[3] Plaintiffs cite to this reference themselves and therefore presumably admit to it.

3

to him about the picture.  (Hernandez depo. at 27.)

Defendant Capps was aware of the picture soon after Defendant Hoover hung it and went to the courthouse to view it himself.  (Capps' Answer ¶ 6; Capps Fact 13; Tercero depo. at 32.) Plaintiff Hernandez told Defendant Capps about the picture and had complained about it to him and other city officials, including Ernie Martinez, City Attorney.  (Hernandez depo. at 103-04; Tercero depo. at 31-32.)  Plaintiff Hernandez also complained about Defendant Hoover's courtroom conduct in 1994.  (Hernandez depo. at 63-64.)  Plaintiff Tercero complained about Defendant Hoover to the City twice a week for the duration of Defendant Hoover's tenure. (Tercero depo. at 162.)  Defendant Capps knew at least as of mid-September 1994 that Defendant Hoover spoke to court employees of religious matters "in a manner that suggests influence of his religious beliefs" and that the employees were uncomfortable as a result.  (Ex. A to Aff. of Capps.)  Plaintiffs contacted the Mayor at various times, apparently beginning the time the Defendant Hoover put the picture on the wall.  (Hernandez depo. at 124; Tercero at 106.)

Sometime between April 1994 and the summer months of 1994,[4] Defendant Hoover brought to the court a flyer advertising a revival to be held at his church, the First Baptist Church in Roswell.  (Cplt. ¶ 11; Capps fact 2; Hernandez depo. at 7; Tercero depo. at 34.)  The revival was to last several days, and each day for the duration Defendant Hoover made announcements to his staff about it.  (Hoover Fact 23.)  He would let them know about the lunch menu, that the food would be inexpensive and that it would be a nice thing to attend.  (Id.)  Plaintiffs did not attend and told Hoover that, if they wanted to, they would go to their own churches.  (Id. Fact

---

[4] Despite extensive briefing, the parties have not informed the court of a precise date, or even a month, when the picture was hung or when the revival took place.

24.)

During 1994, primarily if not entirely in the summer, Defendant Hoover asked Plaintiff Hernandez to ask her friend Terry Romero if Ms. Romero would go out with Defendant Hoover. (Id. Fact 29.)  During the summer and fall of 1994, Defendant Hoover called Plaintiff Hernandez late at night once or twice and approximately four times stopped by Plaintiff Hernandez' home uninvited.  (Id. Facts 30, 33, 35-37.)  Sometime before June 1994 Defendant Hoover admitted to Plaintiffs that he drove his motorcycle without a motorcycle endorsement for his driver's license. (Id. Fact 52.)

Apparently throughout his tenure as judge, Defendant Hoover engaged in other workplace conduct, some of which Plaintiffs witnessed, that can fairly be described as quite unprofessional. (Id. Facts 39-41, 47-51; Tercero depo. at 61.)

In August 1994 a co-worker of Plaintiffs made a sexual harassment complaint against Defendant Hoover.  (Capps Fact 14.)  Defendant Capps directed Siri Cooper, City Administrative Services Manager, to begin an investigation.  (Id. Fact 15.)  Ms. Cooper interviewed all court employees.  (Id. Fact 16.)  On September 12, 1994 Ms. Cooper reported back to Defendant Capps in writing.  (Ex. A to Aff. of Capps.)  The report concluded that Defendant Hoover spoke of religious matters to court employees, solicited dates from relatives and friends of court employees and at times conducted himself in inappropriate and perhaps unlawful ways.  (Id.; Capps Fact 17.)  After reviewing the report, Defendant Capps forwarded it to the District

Attorney.[5]  (Capps Fact 18.)  The District Attorney took no action on it.  (Id.)  On September 21,

1994 Defendant Capps sent a letter and Ms. Cooper's report to the JSC.[6]  (Aff. of Capps ¶ 16.)

On September 30, 1994 Defendant Capps sent a formal complaint to the JSC.[7]  (Id. ¶ 18.)

Defendant Capps attempted to list in the complaint all of the allegations reported to Ms. Cooper,

with the corresponding witnesses who would support those claims.[8]  (Id.)

      In November 1994 Defendant Capps arranged for Plaintiffs and some of their co-workers

to attend three counseling sessions with Dr. Andrew J. Jamison.  (Capps Fact 23.)  Defendant

Capps selected Dr. Jamison.  (Id.)  The sessions took place on November 2, 8, and 16, 1994.

(Id.)  Both Plaintiffs attended the counseling and found it not to be religious in content.

---

[5] Plaintiffs object to the numbered fact containing the assertion that Defendant Capps forwarded Ms. Cooper's report to the District Attorney's office "as to relevance, materiality and hearsay."  (See Pls' Resp. to Capps' Mot. at 11.)  Plaintiffs' objection will be overruled.  First, Plaintiffs' objections appear to be only targeted at the second assertion in numbered fact 18 (that the District Attorney "was not interested in pursuing removing Judge Hoover," in which case their objection is irrelevant because that assertion is not relied on here.  Second, that Defendant Capps forwarded Ms. Cooper's report to the District Attorney is relevant and material to whether he acted in retaliation to any of Plaintiffs' protected speech.  Neither his act nor his statement is hearsay.

[6] Plaintiffs object here on largely the same grounds stated in note 5 supra.  Plaintiffs' objections will be overruled again for the same reasons.  Their one additional objection, to "the tendered exhibit" by which Plaintiffs apparently mean Defendant Capps' September 21, 1994 letter and/or Ms. Cooper's report, will also be overruled.  Defendant Capps' affidavit supports the factual statement that he sent these materials to the JSC.  The Court has not considered the content of the letter or the report in deciding the motion for summary judgment.  Plaintiffs' objection to the admissibility at trial of the letter and/or report will be considered with any other motions in limine to be decided in due course.

[7] Plaintiffs' objections to this fact are overruled.  Again, the basis for this fact is Defendant Capps' affidavit, and again, objections to the admissibility at trial of the correspondence referenced in the affidavit will be addressed in due course.

[8] See note 7 supra.

(Hernandez depo. at 21, 23; Tercero depo. at 71.)  Plaintiff Hernandez wondered what the City's motive was in sending her and her co-workers to a Christian counselor with a Christian orientation.  (Hernandez depo. at 99-100.)  Plaintiff Tercero expressed similar concern.  (Tercero depo. at 163.)  Plaintiff Tercero testified that Defendant Hoover's reaction to the counseling showed how he was "a very vindictive person."  (JSC depo. of Tercero at 62.)

In October or November 1994, apparently following the start of the JSC investigation, Defendant Hoover started a notebook system by which court staff checked in and out of the office.  (Hernandez depo. at 63; Tercero depo. at 78.)  Defendant Hoover claimed he was concerned about the amount of break and lunch time employees were taking.  (Hoover Fact 60.)  The notebook system lasted only a couple of months.  (Hernandez depo. at 63.)

Before Christmas in 1994, Defendant Hoover posted on the front counter area a pamphlet advertising an upcoming Christmas program at his church.  (Pls' Resp. to Hoover, Fact 26 ) (admitted by Defendant Hoover).  The pamphlet could be seen by people walking in the front door to the clerk's office.  (Id.)

Following the beginning of the JSC investigation, Defendant Hoover refused to let Plaintiffs use city time, as they had in the past, to attend planning meetings in April 1995 for a court clerks' conference in June 1995.  (Tercero depo. at 85-87; Hernandez depo. at 71.)  During the time Plaintiffs met with JSC investigators, Defendant Hoover constantly questioned them as to their whereabouts.  (Tercero depo. at 78.)  At some point, during or before November or December 1994, in the course of the JSC investigation, Defendant Hoover forbade Plaintiffs and perhaps other court personnel from taking correspondence from the office.  (Hernandez depo. at 89-90.)  This prohibition was in apparent response to JSC requests for records.  (Id.)

7

At another point following the start of the investigation, Defendant Hoover yelled at

Plaintiff Tercero for being five minutes late for work, even though many other court employees

were present but drinking coffee and not working.  (Tercero depo. at 89-90.)  In the spring or

summer of 1995, Defendant Hoover yelled at Plaintiffs after they had been on break.  (Tercero

depo. at 78-79.)  In May or June 1995 Plaintiffs began meeting with JSC investigator Russell

Mann.  (Tercero depo. at 82.)  In November 1995, after she returned from a meeting with Mann,

Defendant Hoover yelled at Plaintiff Hernandez in the presence of Nilda Balderston (his attorney)

and Plaintiff Tercero.  (Hernandez depo. at 127.)  Plaintiff Hernandez then took five or six days

off of work because of stress.[9]  (Hernandez depo. at 132.)  Plaintiff Hernandez felt afraid for her

safety to the point where she was "a nervous wreck" and had to consult a mental health

professional.  (Hernandez depo. at 70.)  In late November 1995 Defendant Hoover denied to

Plaintiff Tercero her pre-approved vacation time until she first talked with Ms. Balderston about

the ongoing investigation.  (Tercero depo. at 83-84.)  Plaintiff Hernandez said that Defendant

Hoover became progressively more hostile as the December 1995[10] JSC hearing approached, and

after the hearing his hostility increased.  (Hernandez depo. at 93.)  After the start of the JSC

investigation, Defendant Hoover slammed doors and threw papers.  (Tercero depo. at 129-30.)

Plaintiff Hernandez said her anxiety did not abate until Defendant Hoover's removal in March

---

[9] Defendant Hoover's hearsay objection to this fact is overruled.  Defendant Hoover's
unspecified objection may be to the fact that Plaintiff took this time off with her doctor's
approval, a fact which does not influence the disposition of this motion.

[10] The testimony cited does not state when the JSC hearing took place.  However,
Defendant Hoover has agreed to a fact 46 of Plaintiffs' which contains this December 1995 date.

1996.[11]  (Hernandez depo. at 81.)  Plaintiff Tercero saw a gynecologist because of a heavy

menstrual cycle which Plaintiff Hernandez attributed to stress from Defendant Hoover's actions.

(Tercero depo. at 142-43).[12]

Plaintiffs were not evaluated, demoted, or reprimanded during the time Defendant Hoover

was Municipal Judge and their pay was not cut.  (Hoover Fact 70.)[13]  Tercero received a title

change, to Head Clerk, begun by Defendant Hoover's predecessor and completed shortly after

Defendant Hoover took office.  (Tercero depo. at 141.)

Municipal Judge is an elected position over which the New Mexico Supreme Court

exercises superintending control.  (Capps. Facts 32, 34.)  Municipal Court staff are City

employees.  (Capps Fact 37.)  Plaintff Tercero is not aware of any City policy concerning freedom

of speech or religion.  (Tercero depo. at 160.)  Sometime in 1995, the City and/or Defendant

Capps took away Defendant Hoover's administrative powers but then reinstated them.  (Tercero

depo. at 160-61; depo. of Capps in Cobos v. Hoover at 13; Cobos v. Hoover, No. 97-138

PK/JHG, slip. op. at 10-11 (D.N.M. Sept. 24, 1998), amended Sept. 25, 1998.)[14]  Sometime

before the JSC proceeding, Plaintiff Tercero approached Stacye Hunter, City Personnel

---

[11] Defendant Hoover's hearsay objection to this fact is overruled.

[12] Defendant Hoover's hearsay objection to this fact is overruled.

[13] Plaintiffs deny this fact "as stated above and with regard to being screamed at."  (See Pls' Resp. to Hoover at 15 ¶ 70.)  Nothing "above" contradicts the stated fact and it is therefore deemed to be admitted.  See D.N.M. LR-Civ. 56.1.b (deeming material facts admitted unless specifically controverted).

[14] The cited sources do not state when the City's attempted assumption of power occurred.  Plaintiffs state that it was in January 1995.  (See Pls' Resp. to Capps and the City at 6 ¶ 28.) Defendants only objection to ¶ 28, on hearsay grounds, has been withdrawn.

Supervisor, for a job transfer but was told no other positions were open.  (Tercero depo. at 108.)

Plaintiff Hernandez did not know if there were any positions open when she requested a transfer.

(Hernandez depo. at 75.)  Ms. Hunter told Plaintiff Hernandez that she had to fill out an

application, which Plaintiff Hernandez did.  (Id.)  At an unspecified time, Plaintiff Hernandez went

to Ms. Hunter to file a grievance against Defendant Hoover.  Ms. Hunter told Plaintiff Hernandez

that, according to personnel regulations, she could not file a grievance against an elected official.

(Hernandez depo. at 45.)

**III.     Procedural History**

On February 12, 1998 Plaintiffs filed this action.  Plaintiffs allege in Count I a First

Amendment claim based on retaliation in response to protected speech.  Count II avers a First

Amendment Establishment Clause violation for endorsing or advancing religion.  Count III is a

claim for municipal liability based on the assertion that Defendants were policy makers for the

City and that the City has a policy of non-restraint towards Defendant Hoover's conduct.

On May 6, 1998, after entry of an order granting an extension of time, Defendants moved

to dismiss.  On July 13, 1998 I dismissed without prejudice Plaintiffs' claims against Defendants

Capps and the City and dismissed with prejudice Plaintiffs' claims against Defendant Hoover on

the ground that he was not a state actor.  On July 30, 1998 Plaintiffs filed an amended complaint

naming only Capps and the City as Defendants.  The First Amended Count has the same two First

Amendment counts and claim for municipal liability as the original Complaint.  On September 14,

1998 Defendants Capps and the City again moved to dismiss.  By a Memorandum Opinion and

Order filed July 1, 1999 I sua sponte vacated my July 13, 1998 order.

The July 1, 1999 Memorandum Opinion and Order denied Defendants Capps' and the

10

City's first motion to dismiss.  It also denied their second motion to dismiss, which they filed in response to the First Amended Complaint.  Consequently, Plaintiffs' free speech and Establishment Clause claims against Defendant Capps and the City survived.  In the July 1, 1999 Memorandum Opinion and Order, I remarked that Plaintiffs' Establishment Clause claim was weak, and that unless they came forward with admissible evidence that the counseling they received included religious content, the claim could be dismissed on a motion for summary judgment.

The July 1, 1999 Memorandum Opinion and Order also reinstated the case against Defendant Hoover and denied his motion to dismiss because Plaintiffs' First Amended Complaint, combined with the original Complaint, pled sufficient facts to support the contention that Hoover was a state actor under Section 1983.  As a result, Plaintiffs' free speech and Establishment Clause claims against Hoover were revived.

On July 28, 1999 Defendants Capps and the City answered the First Amended Complaint. On December 1, 1999 Defendant Hoover answered the original Complaint (the only Complaint in which he was a named defendant.)

Defendant Hoover now moves for summary judgment based on the following positions: Defendant Hoover at certain times did not act under the color of state law; the statute of limitations bars Plaintiffs' claims; the portrait of Christ, Defendant Hoover's talk at work of the revival, and the Christmas program flyer do not amount to Establishment Clause claims; there are no Establishment Clause claims because Plaintiffs took no offense at the portrait of Christ; the retaliation claims are unsupported by adverse employment actions; and, Defendant Hoover is qualifiedly immune because he was not a policy maker.  Defendants Capps and City of Roswell

11

make the same arguments, adding that the counseling provided was not Christian; Capps is entitled to qualified immunity because First Amendment law in this area remains murky; and the City is not liable because Defendant Hoover was not a policy maker.

### Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.  See Fed. R. Civ. P. 56(c).  When applying this standard, the factual record and reasonable inferences therefrom are examined in the light most favorable to the party opposing summary judgment.  See Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc., 912 F.2d 1238, 1241 (10th Cir. 1990).  The party moving for summary judgment bears the burden of "'showing'--that is, pointing out to the district court-- that there is an absence of evidence to support the nonmoving party's case."  Celotex Corp. v. Catrett, 477 U. S. 317, 325 (1986).  Only then does the burden shift to the non-movant to come forward with evidence showing that there is a genuine issue of material fact.  See Bacchus Indus. Inc. v. Arvin Indus., Inc., 939 F.2d 887, 891 (10th Cir. 1991).  The non-moving party may not avoid summary judgment by resting upon the mere allegations or denials of the pleadings.  See id.

### Discussion

**I.      Statute of limitations assertion**

The December 1, 1999 Pretrial Order indicates that all Defendants raise a statute of limitations defense.  As a result, the defense is preserved for argument in Defendants' motions for summary judgment, notwithstanding the fact that Defendants filed their answers outside of the ten-day time limit provided in Federal Rule of Civil Procedure 12.

Rule 12 states that when a defendant files a motion to dismiss in lieu of a responsive

pleading, and then the motion to dismiss is denied, the defendant must serve a responsive pleading within ten days after notice of the court's action.  See Fed. R. Civ. P. 12(a)(4)(A).  Under Rule 8, defendants must raise all affirmative defenses in their responsive pleadings or risk forfeiting the defenses.  See Fed. R. Civ. P. 8(c).  The purpose behind Rule 8(c) is to put a "plaintiff on notice well in advance of trial that defendant intends to present a defense in the nature of an avoidance." Marino v. Otis Engineering Corp.,  839 F.2d 1404, 1408 (10th Cir. 1988) (quoting State Distribs., Inc., v. Glenmore Distilleries Co., 738 F.2d 405, 410 (10th Cir.1984)).  However, inclusion in a pretrial order may preserve a statute of limitations defense, even when a defendant's answer fails to raise it.  See Expertise, Inc. v. Aetna Finance Co., 810 F. 2d 968, 973 (10th Cir. 1987) (holding limitations defense not in answer but not waived because included in pretrial order which is the controlling document for trial); Allied Chemical Corp. v. Mackay, 695 F.2d 854, 855-56 (5th Cir. 1983) (finding affirmative defense of usury preserved when included in pretrial order at a "pragmatically sufficient time" for plaintiff to respond).

Here Defendants missed the ten-day deadline for filing their answers.  Defendant Capps and the City answered on July 26, 1999 (following the denial of their motion to dismiss on July 1, 1999); Defendant Hoover answered on December 1, 1999 (following his reinstatement as a Defendant and denial of his motion to dismiss on July 1, 1999).  Both answers include a statute of limitations defense.  Plaintiffs argue that Defendants waived the statute of limitations defense because it was not timely raised.  However, Defendant Capps' and the City's July 26, 1999 answer, Defendant Hoover's December 1, 1999 answer, and the December 1, 1999 pretrial order each included the statute of limitations defense, thereby calling it to Plaintiffs' attention well in advance trial.  In Expertise, the defendant omitted completely the statute of limitations defense

from its answer.  See Expertise, 810 F.2d at 973.  But, the defendant included it in the pretrial

order, which was enough to preserve the defense.  See id.  Here the statute of limitations defense

was included in the pretrial order and in Defendants' answers.  The fact that Defendants filed their

answers outside of the ten-day deadline caused no unfair prejudice to Plaintiffs, who had notice of

the defense well before trial.  Consequently, the statute of limitations defense is preserved.

  Plaintiffs additionally argue, but only with respect to the City, that even if the statute of

limitations was not waived, equitable estoppel prevents the City from asserting this defense.  This

argument is based on Plaintiffs' allegation that City Personnel Manager Stacye Hunter refused to

allow Plaintiff Hernandez to file a written grievance against Hoover because of his elected official

status.  A statute of limitations will be equitably tolled "only if there has been active deception of

the claimant regarding procedural requirements."  Jarrett v. U.S. Sprint Communications, Co., 22

F.3d 256, 260 (10th Cir. 1994).  A plaintiff need not declare an intent to sue for the doctrine to

apply but must rely on the assertion to his detriment.  See Tiberi v. Cigna, Corp., 89 F3d. 1423,

1429-30 (10th Cir. 1996).  A plaintiff has the burden of showing facts warranting equitable

tolling.  See id. at 1428.  Plaintiffs here fail to meet their burden.  While there is evidence that Ms.

Hunter told at least Plaintiff Hernandez that she could not file a grievance with the City against

Defendant Hoover while he remained in office, Plaintiffs present no evidence that Ms. Hunter's

statement was false.  Cf. Tiberi, 89 F.3d at 1429 (applying equitable estoppel where defendant

falsely asserted that program in which plaintiff participated was financially sound).  Further,

Plaintiffs also give no indication that they interpreted Ms. Hunter's statement to mean that they

could not seek legal help and relied on it in that way.  Still further, Plaintiffs have presented

evidence that, notwithstanding Ms. Hunter's interpretation of City grievance rules, Plaintiffs

complained repeatedly to many City officials throughout Defendant Hoover's term of office.  In short, they were hardly "actively misled or lulled into inaction."  <u>Johnson v. U.S. Postal Service</u>, 861 F.2d 1475, 1481 (10th Cir. 1989).

## II.     Establishment Clause – Claim II

### A.      Bar of statute of limitations

Plaintiffs sue only under 42 U.S.C. § 1983.  A three-year statute of limitations applies to the section 1983 claims in this case.  <u>See</u> <u>Industrial Constructors Corp. v. U.S. Bureau of Reclamation</u>, 15 F.3d 963, 968 (10th Cir. 1994) (referring to New Mexico law).  Plaintiffs filed their Complaint on February 12, 1998.  At its simplest, the outcome turns on whether any of Defendant's alleged Establishment Clause violations occurred after February 12, 1995.  If not, the statute of limitations bars recovery.

The factual bases for Plaintiffs' Establishment Clause claim are threefold: (1) hanging the portrait of Christ in the courthouse file room; (2) making known at the courthouse the Baptist revival and pressuring employees to attend; and (3) placing the Christmas program flyer in front of the clerk's office.  Along with the alleged municipal liability for allowing this conduct to continue, Defendants Capps and the City are also charged with an Establishment Clause violation for mandating Christian counseling.  There is no dispute that all of these acts at least began in 1994 and that all parties knew about them then.  "Section 1983 claims accrue when the plaintiff knows or has reason to know of the injury that is the basis of the action."  <u>Hunt v. Bennett</u>, 17 F.3d 1263, 1266 (10th Cir.1994) (quoting <u>Johnson v. Johnson County Comm'n Bd.</u>, 925 F.2d 1299, 1301 (10th Cir.1991)).  Therefore, a straightforward application of the statute of limitations dictates that Count II should be dismissed with respect to all Defendants.

Complicating this simplistic analysis somewhat is the continuing violations doctrine, which sometimes operates to toll the statute of limitations in Title VII cases.  The Tenth Circuit has never explicitly held that the continuing violations doctrine applies to section 1983 claims, and has instead suggested that it may be inapplicable.  See Holmes v. Regents of the University of Colorado, No. 98-1172, 1999 WL 285826 at*3 n. 2 (10th Cir. May 7, 1999) (noting that the continuing violation doctrine is a creature of the need to file administrative charges, finding that if it did apply to section 1983 it would not change the result).  However, even if the continuing violations doctrine applies to section 1983 claims generally, it does not apply to Plaintiffs' Establishment Clause claims here.

Under the continuing violations doctrine, Plaintiffs may recover for violations that took place outside of the statutory time limit if at least one act that is a part of a "continuing policy or practice" occurred within the time limit.  Martin v. Nannie and the Newborns, Inc., 3 F.3d 1410, 1415 (10th Cir. 1993).  The Tenth Circuit weighs three factors to determine whether an act qualifies as a continuing violation: (1) subject matter, i.e., whether the violations constitute the same type of discrimination; (2) frequency; and (3) permanence, i.e., whether an employee's awareness of the need to assert her rights was, or should have been, triggered.  See id. at 1415. The first two factors indicate whether the violations were part of a continuing pattern: violations of similar subject matter and with more frequency are more likely to be viewed as a continuing pattern.  The third factor, permanence, goes to whether employees had awareness of rights

16

violations.  Overall, this is not a bright-line test and no one factor is dispositive.[15]  See Bullington

v. United Air Lines, Inc., 186 F.3d 1301, 1311 n.4 (10th Cir. 1999) (citing Purrington v.

University of Utah, 996 F.2d 1025, 1028 (10th Cir. 1993)).  Instead, courts weigh each factor in

context and the nature of the underlying allegations to determine whether the continuing

violations exception applies to a particular case.  See id. (finding no continuing violation,

therefore considering claims only with respect to conduct within limitation period).

       Here only one act with continuing significance could be construed as occurring within the

statutory time period: the hanging of the portrait of Christ in the courthouse file room in 1994 and

its ongoing presence until Defendant Hoover's departure in 1996.  This single, continuous act

obviously meets the subject matter and frequency prongs of the continuing violations test.  The

other two acts allegedly supporting a claimed Establishment Clause violation, pressure to attend

the revival in the spring or summer of 1994 and the posting of the Christmas program flyer in late

1994, are different.  As these acts, and Plaintiffs perceptions of them, began and ended well before

February 12, 1995, they would be barred by the statute of limitations without the continuing

violations doctrine.  Moreover, these two actions are rather like the "discrete unrelated acts" to

which the continuing violation doctrine does not apply.  See Martin, 3 F.3d at 1415.

       Most significantly, however, all of the acts fail on the third prong of permanence.

       The continuing violation doctrine is premised on the equitable notion that the statute of
limitations should not begin to run until a reasonable person would be aware that his or
her rights have been violated.  The permanence prong of the [Martin] test limits the reach
of the continuing violation theory by restricting its operation to those situations

---

[15] This must be so because if factor three of the continuing violation doctrine--that a
section 1983 claim accrues when a plaintiff knows or has reason to know of a cause of action--
was always dispositive, the general rule of Hunt which is the same as Martin factor three would
swallow the continuing violating exception.

underscored by its equitable foundation.  That is, if an event or series of events should
have alerted a reasonable person to act to assert his or her rights at the time of the
violation, the victim cannot later rely on the continuing violation doctrine to overcome the
statutory requirement of filing a charge with the EEOC with respect to that event or series
of events.

Martin, 3 F.3d at 1415 n. 6 (citations omitted).  Early on, Plaintiffs were well aware of a potential

Establishment Clause violation related to the picture of Christ as evidenced by the fact that they

complained about it from the very beginning.  Not only were both Plaintiffs cognizant of a

possible constitutional problem in 1994, they each approached Defendant Hoover and others

working for the City with their concerns long before February 12, 1995.  (See, e.g., Hernandez

depo. at 63-64, 103-04; Tercero depo. at 20-21, 162.)[16]  The premise of the continuing violation

doctrine is thus absent.  The objectionable event--the hanging of the picture of Christ--should

have alerted, and in fact did alert, Plaintiffs to act to assert their rights.  Similarly, Plaintiffs were

aware of any constitutional violation of the two events that entirely pre-dated February 12, 1995--

the alleged pressure to attend the Baptist revival and the posting of the Christmas flyer--at the

times they occurred.  (Tercero depo. at 34, 163; Hernandez depo. at 7-8.)[17]

Weighing the facts of this case, I find that the overwhelming weakness of the permanence

factor overrides the consistent subject matter and frequency factors.  In the face of very different

factual scenarios, courts have weighted the first two prongs in plaintiffs' favor in spite of a

---

[16] Plaintiff Tercero did not testify specifically that she complained to any City official about
the picture of Christ.  She did state that she complained twice a week for the two-year period in
which Defendant Hoover was in office.  Even when viewed in a light most favorable to her, it is
reasonable to conclude from this testimony that her twice-weekly complaints to the City included
mention of the picture of Christ before February 12, 1995.

[17] Plaintiff Hernandez does not specifically note that she was ever alerted to the presence
of the Christmas program flyer.  However, there is no indication that she was unaware of it until
some later date such that it amounts to a continuing violation.

showing under the permanence prong that plaintiffs were reasonably alerted to the claimed

violations.  See Martin, 3 F.3d at 1416 (applying continuing violations doctrine notwithstanding

plaintiff's awareness of rights violations where plaintiff made strong showing of continuous and

frequent sexual harassment, including a rape); White v. Midwest Office Technology, Inc., 5 F.

Supp. 2d 936, 944 (D. Kan. 1998) (following Martin, with hesitation, by applying continuing

violations doctrine where plaintiff alleged repeated sexual harassment during employment).  The

facts of this case, which are quite different, do not warrant tolling of the statute of limitations in

regards to Plaintiffs' Count II.

  The cases upon which Plaintiffs rely do not change the application of the continuing

violation doctrine in this case.  In Robinson v. Marufi, 895 F. 2d 649, 654 (10th Cir. 1990), the

plaintiff maintained his civil rights claim based on malicious prosecution because the court found

that a malicious prosecution claim does not accrue until the prosecution is complete.  The

prosecution had not been completed by the relevant date.  Thus, the different underlying cause of

action in Robinson was entirely within the limitations period.[18]  In Tiberi, 89 F.3d at 1431

(quotation omitted), which was not a civil rights case, the Tenth Circuit recognized that the

continuing wrong doctrine "cannot be employed where the plaintiff's injury is definite and

discoverable, and nothing prevented the plaintiff from coming forward to seek redress."  The

court applied the doctrine in the plaintiff's favor because of the nature of the fraud claim at issue.

The defendant's ongoing false representations keeping the plaintiff in ignorance and the trust

---

  [18] Moreover, Westlaw indicates that Robinson has been "called into doubt" by Smith v.
Gonzales, -- F.3d ---, --- (10th Cir. 2000), No. 99-2267, 2000 WL 1022260, *3 (Jul. 25, 2000).
However, a more reasonable characterization, according to this court, is that Smith merely
distinguishes Robinson and declares Robinson to be in accord with Supreme Court law on the
accrual of § 1983 claims based on alleged unconstitutional criminal convictions.  See id.

relationship between the parties warranted tolling of the statute.  Factors of that nature are not
present in this case.

  The final two cases on which Plaintiffs rely in support of applying the continuing violation
doctrine to reach all conduct before February 12, 1995 are simply not the law in this Circuit.  See
Coleman v. Miller, 885 F. Supp. 1561, 1568 (N.D. Ga. 1995) (finding display of state flag which
included Confederate symbols was a continuing violation); Gonzales v. North Township of Lake
County, 800 F. Supp. 676, 684 (N.D. Ill. 1992) (finding that where crucifix displayed in park,
"each day there is a violation, each day [plaintiff's] cause of action accrues"), reversed on other
grounds, 4 F.3d 1412 (7th Cir. 1993).  If the continuing violation doctrine does apply to section
1983 claims in the Tenth Circuit, Coleman and Gonzales do not help Plaintiffs because those cases
employed the doctrine in a manner different from the way the Tenth Circuit described its use in
this circuit.  On the other hand, if the doctrine does not apply in the Tenth Circuit, Plaintiffs'
reliance on Coleman and Gonzales is unwarranted.  Coleman and Gonzales are thus not
persuasive.

  What remains then, whether or not the continuing violation doctrine applies to the file
room picture, is the post- February 12, 1995 conduct of keeping the picture of Christ on the wall
in the file room.  I have serious doubts about Plaintiffs' apparent position that a fresh limitations
period accrued each moment the image was on display and that, therefore, their Establishment
Clause claim based on the continuous presence of the picture of Christ is timely even if the
continuing violation doctrine is ignored.  The rule in the Tenth Circuit is that "[s]ection 1983
claims accrue when the plaintiff knows or has reason to know of the injury that is the basis of the
action."  Hunt, 17 F.3d at 1266.  Plaintiffs had knowledge of the picture well before February 12,

1995 and therefore the entire Establishment Clause claim is time barred.  However, because Defendants devote such a large portion of their memoranda to alternative arguments that in any event (1) the claim is moot and (2) it does not constitute a First Amendment violation, I feel compelled to address each.

###### B.      Mootness

Defendants note that the picture of Christ did not bother Plaintiff Tercero.  (Tercero depo. at 22.)  Similarly, Plaintiff Hernandez was not offended.  (Hernandez depo. at 27.)  Instead, they objected to the painting's placement in a courthouse.  Defendants thus reason that Plaintiffs suffered no damages.  What is left, Defendants suppose, is Plaintiffs' prayer for injunctive relief, which is now moot.  Defendants argue that since Defendant Hoover is no longer on the bench and the picture is down, there is no live controversy surrounding the claim stemming from the picture.

Defendants are correct.  First, Plaintiffs failed to respond to Defendant Hoover's mootness argument and thus are deemed to have consented to it.  See D.N.M. LR-Civ 7.5(b) ("Failure to serve . . . a response in opposition to any motion constitutes consent to grant the motion.") Second, their response to Defendant Capps' and the City's motion is unpersuasive.

Plaintiffs first respond that equitable relief is still needed because the City has argued elsewhere that the painting does not create an Establishment Clause violation and because Defendant Capps and Plaintiffs still work for the City.  In support they cite Granzeier v. Middleton, 955 F. Supp. 741, 746-47 (E.D. Ky. 1997) in which the court enjoined, without explanation, the posting of a sign with a crucifix on a courthouse door in spite of the fact that the defendants in that case had long since taken the crucifix down and disavowed any intent to use it again.  This remedy cannot be reconciled with the Tenth Circuit's ruling in Bauchman v. West

21

High School, 132 F.3d 542 (10th Cir. 1997).  In Bauchman, the Jewish plaintiff sought

declaratory and injunctive relief, plus damages, under section 1983 based on the religious content

of the music her public school choir director selected for the chorus of which she was a member.

See Bauchman, 132 F.3d at 546.  The court dismissed her claims for declaratory and injunctive

relief (but not her damage claim), because the plaintiff had graduated.  See id. at 548.  As in

Bauchman, "there is no reasonable expectation that [Plaintiff] could again be subjected to the

alleged unconstitutional conduct of [Defendants]" now that one party, in this case Defendant

Hoover, has moved on.  Id.  Plaintiffs' request for injunctive relief is therefore moot.[19]

Second, Plaintiffs' argument for damages stemming from the picture of Christ is

unpersuasive.  Plaintiffs seek "actual and compensatory damages" for all of their claims.  (See

Compl. at 5; First Am. Compl. at 5.)  Yet, with respect to the Establishment Clause claim arising

from the picture of Christ, both Plaintiffs state that the picture of Christ did not offend them.

Nonetheless, Plaintiffs argue that they are entitled to damages because non-pecuniary,

psychological injuries from hurt feelings and tarnished reputations are "no less compensable than

the cost of repairing a broken window pane or a damaged lock."  (Pls' Resp. to Capps and the

City at 19) (citing Corriz v. Naranjo, 667 F.2d 892 (10th Cir. 1981), cert. granted 456 U.S. 971

(1982), cert. vacated, 458 U.S. 1123 (1982).  Likely these are true statements--yet there is

absolutely no evidence of such type of non-pecuniary, emotional injury with respect to the picture

of Christ.  Indeed, Plaintiffs admit to a lack of harm.  Damages would therefore be inappropriate.

See Memphis Community Sch. Dist. v. Stachura, 477 U.S. 299, 307 (1986) ("[T]he basic purpose

of § 1983 damages is to compensate persons for injuries that are caused by the deprivation of

---

[19] Plaintiffs do not seek declaratory relief.

constitutional rights.") (quotation omitted).

Absent compensatory damages and/or declaratory or injunctive relief, nothing remains upon which to append Plaintiffs' claims for punitive damages and attorney fees. Accordingly, Plaintiffs Establishment Clause claim stemming from the picture of Christ is moot.

### C.    Merits

Defendants argue that even if there were an Establishment Clause claim for the post-February 12, 1995 conduct--the continuous display of the picture of Christ to which Plaintiffs did not take offense--such conduct does not make out an Establishment Clause claim. Again, Defendants are correct. First, Plaintiffs failed to respond, this time to Defendant Capps' and the City's argument. Thus, Plaintiffs are deemed to have consented to it. See D.N.M. LR-Civ. 7.5(b). Second, their response to Defendant Hoover's argument is unpersuasive.

In County of Allegheny v. ACLU, 492 U.S. 573, 578-79 (1989), the Supreme Court considered two holiday displays on public property: a creche in the county courthouse and a menorah outside a government building. The creche violated the Establishment Clause; the menorah did not. See id. The Court stated that whether the creche has the impermissible effect of endorsing religion "turns on its setting." Id. The creche stood alone "on the Grand Staircase, the 'main' and 'most beautiful part' of the building that is the seat of county government" which contributed significantly to the finding that it impermissibly endorsed religion. Id. at 599-600. Plaintiffs cite to similar cases in which displays of religions symbols in obviously public places were found unconstitutional. See, e.g., Granzeier, 955 F. Supp. at 746 (finding it "readily apparent" that crucifix on courthouse door violated Constitution); Harvey v. Cobb County, 811 F. Supp. 669, 678 (N.D. Ga. 1993) (finding Ten Commandments on wall in alcove near courtrooms

23

above a marble bench violated Establishment Clause).

What Plaintiffs fail to address is that even when the facts are viewed in a light most favorable to them the file room is not public.  The file room is not analogous to a courthouse door, a Grand Staircase, or even an alcove near a courtroom.  This was a file room to which the public had access, if at all, by permission.  It was no one's permanent workspace and it is described as something of an adjunct to Defendant Hoover's chambers.  Contrary to Plaintiffs' belief, viewers would not necessarily think that this non-public display was only possible with the support and approval of the government.  Under the facts of this case, the non-public wall-hanging did not violate the Establishment Clause.

## III.    The right to speak freely - Count I

### A.    Operation of statute of limitations

Plaintiffs allege one count against all Defendants for retaliation in violation of the First Amendment.  This alleged retaliation takes a variety of forms and stems from multiple acts of protected speech.  Unfortunately, Plaintiffs are never very explicit.  To complicate matters further, acts that might be considered retaliatory occurred both before and after the February 12, 1995 limitations cut-off that would apply in the absence of the continuing violation doctrine.  Nonetheless, the Complaint, the First Amended Complaint, the Pretrial Order, and the two sets of briefs on the motions for summary judgment suggest the following three discrete claims of retaliation.[20]

First, sometime before November 1994 Plaintiffs communicated to Defendant Hoover that

---

[20] The characterizations that follow are also quite similar to those Plaintiffs made previously in their Response to Defendant Capps' and City of Roswell's Motion to Dismiss, filed May 6, 1998, at 4-6.

they did not want to attend his church's revival and that they the did not feel that a picture of

Christ belonged in the file room.  Defendant Hoover retaliated by becoming vindictive and angry.

Plaintiffs do not state what form this vindictiveness and anger took or when it took place.  They

give no indication that it was postponed until after February 12, 1995 or that they were not aware

of it before then.

Second, Plaintiffs allege that they spoke with various City officials before November 1994

concerning Defendant Hoover's conduct.  Plaintiffs allege that Defendant Capps and the City

retaliated against them for this speech, and for directly confronting Defendant Hoover, by sending

Plaintiffs to Christian counseling.  (Plaintiffs at times characterize the counseling as "discipline,"

First Am. Compl. ¶ 21, and as punishment, Pls' Resp. to Capps at 21-22.)  This alleged retaliatory

act began and ended more than three years before Plaintiffs filed the present action.

Third, Plaintiffs cooperated with the JSC investigation which began sometime after

September 30, 1994.  This cooperation, Plaintiffs claim, caused Defendant Hoover to retaliate by

instituting a logbook or notebook check-out system, refusing to let Plaintiffs use work time to

plan for an upcoming court clerks' conference, mandating that correspondence be kept in the

office, yelling at each Plaintiff, throwing papers, slamming doors, and refusing to let Plaintiff

Tercero take a vacation until she spoke with Defendant Hoover's lawyer.  Of these retaliatory

acts for which a date has been provided, only the logbook or notebook system clearly occurred

entirely before February 12, 1995.  Plaintiffs allege that "Defendant Capps and the City again

failed to intervene on their behalf" following Defendant Hoover's alleged retaliation for Plaintiffs'

cooperation with the JSC.  (First Am. Compl. ¶ 27.)

The three year statute of limitations for section 1983 cases bars claims stemming from the

first two acts of retaliation: (1) Defendant Hoover's anger over Plaintiff's speech concerning the picture and the revival and (2) Defendant Capps' and the City's decision to send Plaintiffs to counseling.  It also bars part of the third claim.  The same result obtains when analyzed with respect to the continuing violation doctrine, which as stated may not even apply in this section 1983 case.  See Holmes, 1999 WL 285826 at *3 n. 2.  While the alleged retaliatory acts may have been frequent, the subject matter prong of the continuing violation doctrine is not especially strong.  The protected conduct that provoked retaliatory acts took different forms and occurred at different times.  Moreover, the retaliating party was not also the same in each instance.  Finally, and most significantly, the permanence prong weighs heavily against finding a continuing violation.  If the acts in this case represent a singular act of retaliation, it is obvious that Plaintiffs knew before February 12, 1995 that Defendants were retaliating against them and nothing anyone did obscured that fact from them.

What remains then are a series of acts taken in alleged retaliation for cooperation with the JSC investigation which began in late 1994.  The log book cannot be considered because it was instituted in 1994, before the limitation cut-off of February 12, 1995.  Certain acts, such as Defendant Hoover throwing papers in retaliation for Plaintiffs' participation in the JSC process, have not been dated.  Defendants therefore failed to meet their burden of showing an absence of evidence supporting Plaintiffs' retaliation case with respect to these undated actions.  Most of the other alleged retaliatory acts occurred after February 12, 1995.  These acts may also be considered because they occurred within the limitations period.  See, e.g., Bullington, 186 F.3d at 1312 (dismissing Title VII and ADEA failure to hire claim to the extent based on old decisions not to hire, declining to apply continuing violation doctrine, considering only timely decision not

to hire).  Therefore, Plaintiffs' First Amendment retaliation claim with respect to Plaintiffs' cooperation with the JSC is not time barred in its entirety.

### B.    Adverse action

Defendants argue that they are entitled to summary judgment on the entirety of Plaintiffs' retaliation claim because none of the acts described are adverse actions.  In support they rely on a host of Title VII cases generally supporting the proposition that an adverse action is one which "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment . . . or . . . a significant change in benefits."  Sanchez v. Denver Public Schs., 164 F.3d 527, 532 (10th Cir. 1998) (quoting Burlington Indus., Inc. v. Ellerth, 118 S.Ct. 2257, 2268, (1998).  The only of these that suggests the Tenth Circuit applies the Title VII adverse action standard to First Amendment retaliation claims is Grady v. Shawnee Public School Dist., No. 98-6099, 1998 U.S. App. LEXIS 31077 (10th Cir. Dec. 10, 1999).  In Grady, the Tenth Circuit in an unpublished opinion stated that a plaintiff alleging First Amendment retaliation must show that "engaging in the protected activity was a substantial or motivating factor in the adverse employment action."  See Grady, 1998 U.S. App. LEXIS 31077 at *13.  The Tenth Circuit did not state that only "adverse employment actions," as that term is used in this Circuit's Title VII case law, will support a First Amendment retaliation claim.

To the contrary, the Tenth Circuit in a published opinion stated that, "We reject the defendants' apparent position that only adverse employment decisions, such as termination, suspension, or transfer, in retaliation for constitutionally protected conduct are illegal.  Actions short of an actual or constructive employment decision can in certain circumstances violate the First Amendment.  The delineation of a precise standard shall await another day."  Morfin v.

27

Albuquerque Public Schs., 906 F.2d 1434, 1436 n. 3 (10th Cir. 1990) (citations omitted).  Since

Morfin, the Tenth Circuit has indicated that "the actions complained of must be sufficiently

adverse to present an actual or potential danger that the speech of employees will be chilled."

Keirsey v. Diamond, No. 96-5155, 1998 WL 208860 (10th Cir. Apr. 29, 1998) (affirming

summary judgment for defendants, noting that "many" of twelve actions were not harassment).

Cf. Harrington v. Harris, 118 F.3d 359, 365 (5th Cir. 1997) ("Many actions which merely have a

chilling effect upon protected speech are not actionable.").  In Schuler v. City of Boulder, 189

F.3d 1304, 1310 (10th Cir. 1999) a written reprimand was retaliatory harassment.  In Allen v.

Scribner, 812 F.2d 426, 434 n. 17 (9th Cir. 1997), cited with approval in Morfin, intimidation and

an "entire campaign of harassment," including defamation and confiscating phone messages,

"which though trivial in detail may have been substantial in gross" was actionable harassment.

In this case, Plaintiffs allege a pattern of intimidation, including for example demanding

that Plaintiff speak with Defendant Hoover's lawyer before going on vacation, throwing papers,

slamming doors, and yelling at Plaintiffs with various consequences.  The conduct described in

this case, if proven true at trial, is "sufficiently adverse to present an actual or potential danger

that the speech of employees will be chilled,"  Keirsey, 1998 WL 208860 at **3 (quoting

DeGuiseppe v. Village of Bellwood, 68 F.3d 187, 191 (7th Cir. 1995)), and supports Plaintiffs'

claim that Defendant Hoover retaliated against them for participating in the JSC investigation of

him.

## C.   Defendant Hoover

Defendant Hoover alternatively moves for summary judgment on the ground that he did

not act under color of law and that he is immune from suit.  Having already determined that

Plaintiffs' Establishment Clause claim should be dismissed, the relevant inquiry here is whether Defendant Hoover acted under color of law when he committed the alleged retaliatory acts and whether he is entitled to qualified immunity from suit for those acts.

       **1.**      **Color of law**

If Plaintiffs' are to prevail on their claims, they must prove that all Defendants acted "under color" of state law. In the July 1, 1999 Memorandum Opinion and Order, I commented that Plaintiffs' factual allegations of a "real nexus" between Defendant Hoover's conduct and his "badge" of authority were not particularly strong. Defendant Hoover now contends that certain of his actions were not done under color of law because they occurred after hours or outside of the office. Specifically, Defendant Hoover argues that his calls to Plaintiffs at night, going to Plaintiff Hernandez' house on weekends, and his failure to obtain permission to drive a motorcycle were not actions taken under color of state law. Plaintiffs respond that the question is moot because Defendant Hoover admitted in his answer that he acted under color of state law.

Defendant Hoover's interpretation of his answer is questionable. Plaintiffs allege in paragraph six of the original Complaint that "At all material times, Defendant Hoover acted (a) under color of law . . . ." In answer to paragraph six of Plaintiffs' complaint, Defendant Hoover states that he "acted under color of law, but denies each and every other allegation . . . ." The negative implication Defendant Hoover sees in his answer, that at certain material times he did not act under color of law, is strained at best.

However, even if Defendant Hoover has not conceded the color of law question, his position is not supported by the law or the facts. The remaining claim against Defendant Hoover--for retaliation in response to cooperation with the JSC--was conduct which even Defendant

29

Hoover does not claim lacked a real nexus to his badge of state authority.  Instead, he restricts his color of law arguments to conduct that did not involve retaliation in response to Plaintiffs' cooperation with the JSC investigation.  Moreover, there is no doubt that the alleged retaliatory acts remaining at issue, all taken at the office and relating to Defendant Hoover's position of power, had a real nexus to his authority.  See Tercero v. City of Roswell, Civ. No. 98-190 JP/WWD, Doc. No. 46, slip op. at 3-4 (D.N.M. July 1, 1999) (collecting cases).  With respect to Plaintiffs' claim of retaliation, Defendant Hoover acted under color of law.

### 2.    Qualified immunity

"The doctrine of qualified immunity shields individual government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Butler v. City of Prairie Village, 172 F.3d 736, 745 (10th Cir. 1999) (quotation omitted).

Defendant Hoover argues that Plaintiffs "have not clearly established a right violated" and that no adverse action was taken against Plaintiffs.  (Memo. in Supp. of Hoover at 22.)  As already stated, Plaintiffs have adequately alleged and supported a claim that Defendant Hoover took an action against them in retaliation for speech protected by the First Amendment.  To the extent Defendant Hoover argues that the right to speak freely without retaliation was not clearly established at the time the alleged retaliatory acts occurred, Defendant Hoover is incorrect.  See Connick v. Myers, 461 U.S. 138, 142 (1983); Schuler, 189 F.3d at 1309 (noting that in 1995 it was clear that "there were deprivations less harsh than dismissal which nevertheless violated a public employee's rights" to be free from retaliation for exercising the First Amendment right to

speak freely).  Defendant Hoover is not entitled to qualified immunity.

### D.    Defendant Capps

Defendant Capps argues that he is entitled to qualified immunity on the ground that "First Amendment establishment law is far from clear."  Whether or not Defendant Capps is correct, the Establishment Clause count will be dismissed for reasons stated <u>supra</u>.  Nonetheless, the briefing of this qualified immunity question (and others) illustrates an interesting point with respect to the retaliation claim:  Plaintiffs have no claim of that nature against Defendant Capps and the City arising out of their participation in the JSC proceeding concerning Defendant Hoover.  While the First Amended Complaint could be read to attempt to assert a claim against Defendant Capps and the City for retaliation in relation to the JSC proceeding, <u>see</u> First Am. Compl. ¶ 27, the briefing of the motions for summary judgment leaves serious doubt as to whether Plaintiffs intended such a claim or whether they still advance it.[21]  For instance, although Defendant Capps argues for qualified immunity from suit under every count, he bases his argument only on the lack of clarity of Establishment Clause law.  Plaintiffs respond by arguing simply that (1) the Establishment Clause law is clear and (2) no one can be punished for expressing their views on religion. Plaintiffs make no mention of retaliation for participation in the JSC process.  The only type of punishment or discipline Plaintiffs describe having received at the hands of Defendant Capps was Christian counseling  (<u>See</u> First. Am. Compl. ¶ 21; Pretrial Order at 2.)  But the claims based on this counseling are barred by the statute of limitations.  Also significant is Plaintiffs' failure to

---

[21] Paragraph 26 of the First Amended Complaint alleges that Plaintiffs testified in the JSC proceeding.  Paragraph 27 reads "Thereafter Judge Hoover took further retaliatory acts . . . and Defendant Capps and the City again failed to intervene."  The Pretrial Order at page 2 states that Plaintiffs "were punished by Defendants Hoover, Capps and the City . . . for their protected speech, including by being sent to mandatory religious counseling."

respond to Defendant Capps and the City's argument entitled "Plaintiffs do not have a valid claim for retaliation against the Defendants Capps and the City of Roswell." (<u>See</u> Memo. of Auth. in Supp. at 17.)[22]

Even if it is assumed that Plaintiffs have attempted to make a claim, which they have not abandoned, against Defendant Capps and the City for retaliating against them for participating in the JSC investigation, Defendant Capps will be immune from suit. "Once a defendant pleads qualified immunity, the plaintiff bears the burden of (1) coming forward with sufficient facts to show that the defendant's actions violated a federal constitutional or statutory right and (2) demonstrating that the right violated was clearly established at the time of the conduct at issue." <u>See</u> <u>Baptiste v. J.C. Penney Co.</u>,147 F.3d 1252, 1255 (10th Cir. 1998). To prove that Defendant Capps violated Plaintiffs' constitutional right to be free from retaliation for their protected speech, Plaintiffs must show, inter alia, that their speech was a "substantial or a motivating factor" in the detrimental action. <u>Conaway v. Smith</u>, 853 F.2d 789, 795 (10th 1988). Plaintiffs have produced no evidence that their speech to the JSC investigators was a substantial or motivating factor in any failure on Defendant Capps' part "to intervene on their behalf." (First Am. Compl. ¶ 27.) To the contrary, it was Defendant Capps who first contacted the JSC about Defendant Hoover's possible judicial impropriety. Plaintiffs offer no reason, and none is apparent, why Defendant Capps would then seek to retaliate against them for cooperating with that investigation. Hence the claims against Defendant Capps should be dismissed.

---

[22] This argument of Defendant Capps and the City is nearly the same argument made by Defendant Hoover based on application of the Title VII adverse action standard, to which Plaintiffs did respond.

E.        **Municipal liability under section 1983**

The City moves for summary judgment on the alternative ground that Defendant Hoover was not a policy maker for the City and thus the City cannot be liable under section 1983. Plaintiffs respond by refuting this argument and adding two other theories of municipal liability: that the City is liable because Defendant Capps was a policy maker and because the City maintained a policy of deliberate indifference to Plaintiffs' constitutional rights.  Since Defendant Capps will be dismissed, as discussed supra, the City cannot be liable for any of his decisions as City policy maker.

Defendant Hoover was not a policy maker.  A plaintiff seeking to hold a municipality liable under section 1983 must "demonstrate that, through its deliberate conduct, the municipality was the moving force behind the injury alleged."  Board of County Comm'rs v. Brown, 520 U.S. 397, 404 (1997).  Municipal liability may not be imposed for the acts of a municipal official based on a respondeat superior theory.  See Jantz v. Muci, 976 F.2d 623, 630 (10th Cir. 1992). "Rather, such liability may be imposed only if the employee possesses 'final authority' under state law to establish policy with respect to the challenged action."  Id.

In a related case, Cobos v. Hoover, Tenth Circuit Court of Appeals Judge Paul J. Kelly, presiding at trial by designation, thoroughly analyzed Defendant Hoover's relationship with the City and concluded that Defendant Hoover was not a policy maker and that therefore the City could not be sued based on Judge Hoover's acts.  See Cobos v. Hoover, No. 97-138 PK/JHG, slip. op. at 7-11 (D.N.M. Sept. 24, 1998), amended Sept. 25, 1998.  Judge Kelly first found that the shared responsibility for personnel decisions between Defendant Hoover and the City did not permit the conclusion that Defendant Hoover was a final City policy maker.  Id. at 7.  Judge Kelly

further noted the problem of attributing municipal liability in a situation where the City lacks

power, recognizing that a municipal court in New Mexico is a creature of state law.  Id. 7-8

(citing Mowrer v. Rusk, 618 P.2d 886, 894 (N.M. 1980)).  Still further, Judge Kelly observed

fault and causation problems that also plague this case.  "Far from officially sanctioning, ordering

or condoning the practices of Defendant Hoover, the City" promptly initiated a JSC investigation

and even attempted to assume supervision of court employees but was unable to do so because

state law precluded it.  Id. at 10.  Judge Kelly concluded by noting that even in a light most

favorable to Plaintiffs, the evidence did not support the proposition that the City engaged in

deliberate conduct that was the moving force behind the alleged civil rights violation.  See id. at

11. So too in this case there is no evidence that the City acted deliberately to violate Plaintiffs'

right to be free from retaliation in cooperating with the JSC investigation.

Plaintiffs' remaining theory for municipal liability is that the City "promulgated a policy of

deliberate indifference to Plaintiffs' constitutional rights."  (Pls' Resp. to Capps and the City at

20.)  They argue that the City followed a policy of ratifying and acquiescing to Defendant Hoover

rather than protecting its employees' constitutional rights.  Plaintiffs cite no case law.  They argue

that (1) Defendant Capps and Ernie Martinez told Plaintiffs that their complaints were groundless

while admitting they were true; (2) the City used City funds to pay a Christian counselor; (3) the

City paid workers who returned late from lunch while attending the revival in 1994, (4) the City

refused to transfer Plaintiffs; and (5) Stayce Hunter refused to let Plaintiff Hernandez file a

grievance.

Plaintiffs' argument fails.  "[D]eliberate indifference is a stringent standard of fault,

requiring proof that a municipal actor disregarded a known or obvious consequence of his

action." See Board of County Comm'rs, 520 U.S. at 410.  As noted earlier with respect to

Defendant Capps, the City through Defendant Capps did not disregard what was occurring in the

courthouse with respect to possible retaliation for participation with the JSC.  Instead, the City

believed there was a problem and took what corrective actions it felt it could within the separation

of powers doctrine.[23]  Plaintiffs present no evidence that the City deliberately and with

indifference injured Plaintiffs' constitutional rights by refusing to transfer them.  In fact, Plaintiff

Hernandez indicated that the City, through Ms. Hunter, told her to apply for other City jobs by

completing applications.  Plaintiff Tercero said that there were no other City job openings.  That

Plaintiff Hernandez could not complete a City grievance form against an elected Municipal Judge

also does not amount to a policy of deliberate indifference to Plaintiffs' right to be free from

retaliation for cooperation with the JSC.  Plaintiffs have not shown that the City acted with

deliberate indifference.  Thus their claim for municipal liability will be dismissed.

---

[23] The rights to which the City was presumably indifferent with respect to the picture of
Christ and the revival are those under the Establishment Clause, the assertion of which is barred
by the statute of limitations.

35

IT IS THEREFORE ORDERED that

(1) Defendant Capps and the City's motion for summary judgment (Doc. No. 62) will be granted; and

(2) Defendant Hoover's motion for summary judgment (Doc. No. 67) will be denied with respect to Plaintiffs' claims that Defendant Hoover retaliated against Plaintiffs for participating in the JSC investigation of Defendant Hoover and granted in all other respects.

_____
**UNITED STATES DISTRICT JUDGE**